**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AHS Management Company, Inc. d/b/a Ardent Health, <br><br> Plaintiff, <br><br> v. <br><br> Claritev Corp. f/k/a MultiPlan, Inc.; 90 Degree Benefits, LLC; Aetna, Inc.; Allied National, LLC; Benefit Plans Administrators of Eau Claire, LLC; Central States Southeast and Southwest Areas Health and Welfare Fund; Elevance Health Inc.; Kaiser Foundation Health Plan, Inc.; Oscar Health, Inc.; Point C Health, LLC, <br><br> Defendants. | Case No. 1:26-cv-06217 <br><br> MDL No. 3121 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**AHS MANAGEMENT COMPANY, INC. D/B/A ARDENT HEALTH'S DIRECT ACTION PLAINTIFF SHORT-FORM COMPLAINT**

The Plaintiff named below files this Short-Form Complaint and (if checked off below) Demand for Jury Trial against the Defendant(s) named below by and through the undersigned counsel. Plaintiff incorporates by reference the factual allegations, as well as the claims and relief checked off below, sought in the Consolidated Master Direct Action Plaintiff Complaint ("Consolidated Master DAP Complaint") as it relates to the named Defendant(s) (checked-off below), filed in *In re Multiplan Health Insurance Provider Litigation*, MDL No. 3121, in the United States District Court for the Northern District of Illinois. Plaintiff files this Short-Form Complaint pursuant to Case Management Order No. 6, filed on the MDL Docket (No. 1:24-cv-06795) at ECF 179.

1

Plaintiff indicates by checking the relevant boxes below the Parties, Designated Forum, Jurisdiction and Venue, Causes of Actions and other Relevant Information specific to Plaintiff's case. Plaintiff, by and through the undersigned counsel, alleges as follows:

## I.      IDENTIFICATION OF PARTIES

**1. PLAINTIFF**

2. Name of the Plaintiff alleging claims against Defendant(s): **AHS Management Company, Inc. d/b/a Ardent Health ("Plaintiff")**

3. For each Plaintiff that is a corporation, list the state of incorporation and state of principal place of business. For each Plaintiff that is an LLC or partnership, list the state citizenship of each of its members. For each Plaintiff that is a natural person, list the state of residency and citizenship at the time of the filing of this Short-Form Complaint [Indicate State[s]]:

**State of Incorporation and Principal Place of Business: Tennessee**

**4. DEFENDANT(S)**

5. Plaintiff names the following Defendant(s)[1] in this action [*Check all that apply*]:

| | |
|---|---|
| X | Claritev Corp. f/k/a MultiPlan, Inc. |
| X | Aetna, Inc., a subsidiary of CVS Health Corporation |
| | Blue Shield of California Life & Health Insurance Company |
| | Blue Cross Blue Shield of Michigan Mutual Insurance Company |
| | Aware Integrated, Inc. and BCBSM, Inc. d/b/a Blue Cross Blue Shield Of Minnesota |
| | Cambia Health Solutions, Inc. f/k/a The Regence Group |
| | Centene Corporation |
| | The Cigna Group |

---

[1] Each Defendant named in this Short-Form Complaint acted directly or through each of that entity's executives, employees, directors, and majority-owned subsidiaries. For example, UnitedHealth Group Inc. acted directly or through, among others, the following majority-owned subsidiaries: United Healthcare Insurance Company, and its affiliates; United Healthcare Services Inc.; United Healthcare Service LLC; Oxford Benefit Management, Inc.; UMR, Inc.; Sierra Health and Life Insurance Company, Inc.; Sierra Health-Care Options, Inc.; Health Plan of Nevada, Inc.; and United Healthcare of Florida, Inc.

| | |
|---|---|
| X | Elevance Health, Inc. f/k/a Anthem, Inc. |
| | Health Care Service Corporation |
| | Highmark Health |
| | Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey |
| | Humana Inc. |
| X | Kaiser Foundation Health Plan, Inc. |
| | Molina Healthcare, Inc. |
| | UnitedHealth Group Inc. |
| X | Allied National, LLC |
| X | Benefit Plans Administrators of Eau Claire, LLC |
| X | Central States Southeast and Southwest Areas Health and Welfare Fund |
| | Consociate, Inc. d/b/a Consociate Health |
| | Healthcare Highways Health Plan (ASO), LLC |
| | Secure Health Plans Of Georgia, LLC d/b/a Secure Health |
| | Sanford Health Plan |
| | CareFirst Of Maryland |
| | Blue Cross Blue Shield of Massachusetts |

## 6. OTHER DEFENDANTS

7. For each "Other Defendant" Plaintiff contends are additional parties and are liable or responsible for Plaintiff's damages alleged herein, Plaintiff must identify by name each Defendant and its citizenship, and Plaintiff must plead the specific facts supporting any claim against each "Other Defendant" in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff may attach additional pages to this Short-Form Complaint.

3

| | NAME | CITIZENSHIP |
|---|---|---|
| 1 | Oscar Health, Inc. | Delaware, New York |
| 2 | 90 Degree Benefits, LLC | Alabama |
| 3 | Point C Health, LLC | Delaware, Illinois |

## II.     DESIGNATED FORUM

8.  For Direct Filed Cases: Identify the Federal District Court in which the Plaintiff would have filed in the absence of direct filing: **Northern District of Illinois**

9.  For Transferred Cases: Identify the Federal District Court in which the Plaintiff originally filed and the date of filing: **Not Applicable**

## III.     JURISDICTION AND VENUE

10. Subject Matter Jurisdiction is based on:

☐        Diversity of Citizenship
☒        Federal Question
☐        Other (The basis of any additional grounds for jurisdiction must be pled in sufficient detail as required by the applicable Federal Rules of Civil Procedure):

_____

_____

## IV.     FACTS AND INJURIES ASSERTED

11. Plaintiff adopts all paragraphs of the Consolidated Master DAP Complaint by reference, except for the allegations set forth in any cause of action that Plaintiff does not adopt (as indicated below). **Plaintiff adopts all allegations in the Consolidated Master DAP Complaint.**

12. Plaintiff adopts and alleges as injuries resulting from the challenged conduct the injuries to DAPs set forth in the Consolidated Master DAP Complaint.

## V.     ADDITIONAL FACTS DEMONSTRATING STANDING TO BRING CAUSES OF ACTION

13. Plaintiff alleges the following additional facts in support of its standing to bring causes of action:

**See attached additional pleadings.**

## VI. CAUSES OF ACTION ASSERTED

14. Plaintiff adopts and asserts the following Causes of Action alleged in the Consolidated Master DAP Complaint, and the allegations with regard thereto, against the Defendants identified above (*check all that are adopted*).

| Check all that apply | Count | Cause of Action | Law pursuant to which the cause of action is asserted in the Master Complaint |
|---|---|---|---|
| ☐ | I | Horizontal Agreements in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | II | Hub-And-Spoke Agreement in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | III | Principal-Agent Combinations in Restraint of Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | IV | Agreements to Unreasonably Restrain Trade (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☒ | V | Anticompetitive Information Exchange (Section 1 of the Sherman Act, 15 U.S.C. § 1) | Federal Law |
| ☐ | VI | Violation of State and D.C. Antitrust Statutes | |
| ☐ | VII | Violation of State Consumer Protection Laws | |
| ☐ | VII | Unjust Enrichment | |

**NOTE**

If Plaintiff wants to allege additional Causes of Action other than those selected in the preceding paragraph, which are the Causes of Action set forth in the Master Complaint, the facts supporting those additional Causes of Action, must be pled in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff may attach additional pages to this Short-Form Complaint.

## VII.   ADDITIONAL CAUSES OF ACTION

15. Plaintiff asserts the following additional Causes of Action and supporting allegations against the following Defendants:

**See attached paragraphs of supporting allegations.** _____

_____

_____

_____

## VIII.   PRAYER FOR RELIEF

16. *Check all that apply*:

[X]   **WHEREFORE,** Plaintiff prays for all available compensatory damages, treble damages, punitive damages in amounts to be proven at trial, and judgment against Defendant(s) and all such further relief that this Court deems equitable and just as set forth in the Master Complaint, and any additional relief to which Plaintiff may be entitled, including disgorgement.

[X]   **WHEREFORE,** Plaintiff prays for declaratory and injunctive relief and judgment against Defendant(s) and all such further relief that this Court deems equitable and just as set forth in the Master Complaint, and any additional relief to which Plaintiff may be entitled.

## JURY DEMAND

[*Check the applicable box*]:

[X]   Plaintiff hereby demands a trial by jury as to all claims in this action.

[ ]   Plaintiff **does not demand** a trial by jury as to all claims in this action.

****

By signature below, Plaintiff's counsel hereby confirms their submission to the authority and jurisdiction of the United States District Court of the Northern District of Illinois and oversight of counsel's duties under Federal Rule of Civil Procedure 11, including enforcement as necessary through sanctions and/or revocation of *pro hac vice* status.

6

Dated: May 27, 2026

/s/ Stephen M. Medlock

Stephen M. Medlock
Stephen Cohen (*pro hac vice* forthcoming)
Rami Abdallah E. Rashmawi (*pro hac vice* forthcoming)
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W.
Suite 500 West
Washington, DC 20037
Tel: (202) 639-6500
Fax: (202) 639-6604
smedlock@velaw.com
scohen@velaw.com
rrashmawi@velaw.com

Michael Scarborough (*pro hac vice* forthcoming)
Dylan Ballard (*pro hac vice* forthcoming)
Madison Lo (*pro hac vice* forthcoming)
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6900
Fax: (415) 651-8786
mscarborough@velaw.com
dballard@velaw.com
mlo@velaw.com

Mackenzie Newman (*pro hac vice* forthcoming)
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000
Fax: (212) 237-0100
jmcgovern@velaw.com
mnewman@velaw.com

*and*

/s/ Ryan T. Holt

Ryan T. Holt
Eric G. Osborne (*pro hac vice* forthcoming)
Lauren Z. Curry (*pro hac vice* forthcoming)
David H. Suggs (*pro hac vice* forthcoming)
Micah N. Bradley (*pro hac vice* forthcoming)
**SHERRARD ROE VOIGT &**

7

**HARBISON, PLC**
1600 West End Ave., Suite 1750
Nashville, Tennessee 37203
Tel: (615) 742-4200
Fax: (615) 742-4539
rholt@srvhlaw.com
eosborne@srvhlaw.com
lcurry@srvhlaw.com
dsuggs@srvhlaw.com
mbradley@srvhlaw.com

*Counsel for Plaintiff*

8

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney certifies that on May 27, 2026, he electronically filed a copy of the attached via the CM/ECF filing system, which sent notification of such filing to all Filing Users.

<u>*/s/ Stephen M. Medlock*</u>
Stephen M. Medlock

## ADDITIONAL FACTUAL ALLEGATIONS

1. AHS Management Company, Inc. d/b/a Ardent Health ("Plaintiff") is a Tennessee corporation with its principal place of business at 340 Seven Springs Way, Brentwood, Tennessee 37027. Plaintiff is affiliated with Ardent Health, Inc. ("Ardent Health") and is the assignee of all claims in this action owned by Ardent and its affiliates. Plaintiff is asserting the claims of Ardent Health and its affiliates in this action.

2. Founded in 2001, Ardent Health has approximately 24,000 employees and 1,900 physicians, providing medical services to more than 15,000 patients per day.

3. Ardent Health owns and operates 30 hospitals across six states, including Idaho, Kansas, New Jersey, New Mexico, Oklahoma, and Texas. The respective locations and services of these hospitals are as follows.

   a. Bailey Medical Center, located in Owasso, Oklahoma, is a 73-bed full-service hospital offering primary and specialty care, including general surgery, obstetrics and gynecology, orthopedics, and emergency care.

   b. BSA Hospital, located in Amarillo, Texas, serves the Texas Panhandle and tri-state area with over 450 physicians and a wide array of inpatient and outpatient services.

   c. Hackensack Meridian Mountainside Medical Center, located in Montclair, New Jersey, is a full-service community hospital founded in 1891 with 365 licensed beds.

   d. Hackensack Meridian Pascack Valley Medical Center, located in Westwood, New Jersey, is a full-service community hospital with 128 licensed beds.

10

e. Hillcrest Hospital Claremore, located in Claremore, Oklahoma, is a 49-bed acute care center offering 24/7 emergency services, ICU and cardiology, orthopedic surgery, and maternity care.

f. Hillcrest Hospital Cushing, located in Cushing, Oklahoma, is a 99-bed community hospital providing 24/7 emergency services, rehabilitative care, diagnostic imaging, urology, mental health and wellness services, and orthopedic treatments.

g. Hillcrest Hospital Henryetta, located in Henryetta, Oklahoma is a 30-bed acute care center providing 24/7 emergency services, diagnostic imaging, orthopedic care, inpatient drug and alcohol withdrawal services, sleep disorder treatment, and women's health.

h. Hillcrest Hospital Pryor, located in Pryor, Oklahoma, is a 30-bed acute care center providing inpatient and outpatient care, including 24/7 emergency services, diagnostic imaging, rehabilitative care, orthopedic services, and women's health.

i. Hillcrest Hospital South, located in Tulsa, Oklahoma, is a 180-bed full-service hospital delivering a comprehensive range of inpatient and outpatient services.

j. Hillcrest Medical Center, located in Tulsa, Oklahoma, is a 656-bed hospital founded in 1918. It offers specialized services including burn care, women's health, orthopedics, rehabilitation, cancer therapy, and cardiovascular care.

k. Lovelace Medical Center, located in Albuquerque, New Mexico, is a 263-bed hospital offering 24/7 emergency care, orthopedic surgery, and stroke and cardiology services.

11

l.  Lovelace Regional Hospital, located in Roswell, New Mexico, is a 27-bed acute care hospital providing 24/7 emergency services, intensive care, rehabilitation, surgical services, and birthing services.

m.  Lovelace UNM Rehabilitation Hospital, located in Albuquerque, New Mexico, is a rehabilitation hospital providing extensive inpatient and outpatient services for recovery from major injuries and illnesses.

n.  Lovelace Westside Hospital, located in Albuquerque, New Mexico, is a 92-bed acute care facility offering 24/7 emergency care, a state-of-the-art sleep center, a nationally accredited bariatrics program, and multiple surgical services.

o.  Lovelace Women's Hospital, located in Albuquerque, New Mexico, is New Mexico's only hospital devoted to women's health, providing 173 beds, a level III neonatal intensive care unit, a breast care center, and robotic surgery.

p.  Panhandle Surgical Hospital, located in Amarillo, Texas, is a surgical hospital providing neurosurgery, orthopedics, ear, nose, and throat care, gynecology, robotic surgery, and general surgery.

q.  Portneuf Medical Center, located in Pocatello, Idaho, is a full-service hospital that includes a level II trauma center serving eastern Idaho.

r.  Quail Creek Surgical Hospital, located in Amarillo, Texas, is a surgical hospital offering neurosurgery, orthopedics, ear, nose, and throat care, gynecology, robotic surgery, and general surgery.

s.  Seton Medical Center Harker Heights, located in Harker Heights, Texas, is an 83-bed full-service hospital providing 24-hour emergency care and numerous inpatient and outpatient services.

12

t.  The University of Kansas Health System Saint Francis Campus, located in Topeka, Kansas, is a full-service hospital founded in 1909 with 378 licensed beds.

u.  Tulsa Spine & Specialty Hospital, located in Tulsa, Oklahoma, is an acute care center specializing in ear, nose, and throat care, gynecology, orthopedics, sleep disorder treatment, and surgical services.

v.  UT Health Athens, located in Athens, Texas, is a 127-bed full-service hospital delivering a broad range of inpatient and outpatient services to East Texas.

w.  UT Health Carthage, located in Carthage, Texas, provides a level IV trauma center, advanced diagnostic technology, a sleep lab, and cardiac and pulmonary rehabilitation.

x.  UT Health East Texas Rehabilitation Center, located in Tyler, Texas, is a 49-bed inpatient rehabilitation hospital providing 24/7 nursing care, personalized treatment plans, and outpatient clinics.

y.  UT Health Henderson, located in Henderson, Texas, is a 42-bed hospital offering a level IV trauma center, level IV acute stroke facility, diagnostic services, labor and delivery, surgical suites, and acute withdrawal programs.

z.  UT Health Jacksonville, located in Jacksonville, Texas, is a full-service hospital providing a wide range of inpatient and outpatient services to East Texas.

aa. UT Health North Campus Tyler, located in Tyler, Texas, is a 174-bed facility, the region's first academic medical center, offering 24/7 emergency services with a level IV trauma center, oncology services, a behavioral health unit, and a gastroenterology lab.

13

bb. UT Health Pittsburg, located in Pittsburg, Texas, is a 25-bed critical access hospital offering a level IV trauma center, a level III stroke facility, inpatient and outpatient care, surgical services, and a sleep center.

cc. UT Health Quitman, located in Quitman, Texas, is a 25-bed hospital with a level IV trauma center, level IV stroke facility, swing bed program for transitional care, sleep lab, surgical suites, and multispecialty clinics.

dd. UT Health Tyler, located in Tyler, Texas, is the flagship hospital of UT Health East Texas, with 424 beds, the region's only level I trauma center, a comprehensive stroke center, and extensive inpatient and outpatient services.

4. Ardent Health routinely provides out-of-network (OON) services to patients and submits bills for those services to the third-party payors responsible for adjudicating and paying those claims. These third-party payors include known users of MultiPlan's OON Repricing Services, such as Aetna, Elevance, Kaiser, Allied National, 90 Degree Benefits, and Oscar Health.

5. Ardent Health is harmed by the MultiPlan Cartel, because it submitted claims for out-of-network care that were underpaid by members of the MultiPlan Cartel.

6. Members of the MultiPlan Cartel used MultiPlan's common OON pricing methodology to set prices for those OON services regardless of the reasonableness of Ardent Health's billed charges. For example, when Ardent Health submitted a claim for $852, MultiPlan's Data iSight methodology set a price of just $189 for that OON service. When Ardent Health submitted another $634 claim for OON services, Data iSight set a price of $62.

7. Upon information and belief, each of the defendants named in this short-form complaint, including Defendants Aetna, Elevance, Kaiser, and Oscar Health, Inc., have each executed an out-of-network pricing agreement with MultiPlan, have abdicated out-of-network

14

pricing authority to MultiPlan, and have performed other acts and made other statements in furtherance of the conspiracy.

8.      **90 Degree Benefits.** Defendant 90 Degree Benefits, LLC. ("90 Degree") is an Alabama limited liability company with its principal place of business in Birmingham, Alabama. Previously known as Employee Benefit Claims of Wisconsin, Inc,; Employee Benefit Consultants, Inc.; and EBSO, Inc., 90 Degree is a wholly-owned subsidiary of Blue Cross Blue Shield of Alabama.

9.      90 Degree is a third-party administrator (TPA). It provides administrative services for self-insured health plans offered by employers. Functionally, those administrative services plans are no different than the administrative services only (ASO) health plans offered by UnitedHealthcare, Cigna, Aetna, and Blue Cross Blue Shield health plans. Under an ASO health plan, the TPA administers all aspects of the health plan network and out-of-network healthcare benefits. The TPA assembles a network of healthcare providers and charges monthly fees to the employer for access to that network and other administrative services. The TPA receives bills from OON healthcare providers, adjudicates those claims, set prices for those claims, and pays the claims. The TPA pays claims using money drawn from a special bank account funded by the employer, making the employer ultimately financially responsible for paying benefits for in-network and OON services.

10.     90 Degree operates through several wholly-owned subsidiaries, including Allied National, Caprock Healthplans, EBSO, Entrust (a/k/a 90 Degree Benefits Houston), MCA Administrators (a/k/a 90 Degree Benefits PA), Healthcare Solutions Group (Oklahoma), 90 Degree Benefits Florida, and 90 Degree Benefits San Antonio. On July 18, 2020, 90 Degree obtained majority control over Defendant Allied National. Indeed, Allied National markets itself as "Allied

National a 90 Degree Benefit Company." As a TPA, Allied Benefit performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

11. On or about September 1, 2021, 90 Degree's wholly-owned subsidiary, Preferred Care Services, Inc., d/b/a 90 Degree Benefits, entered into a Client Services Agreement with MultiPlan. Among other things, 90 Degree agreed to send some of its qualifying out-of-network claims to Data iSight for repricing. 90 Degree's Client Services Agreement with MultiPlan contains a confidentiality clause that permits MultiPlan to utilize 90 Degree's confidential and competitively-sensitive out-of-network claims data to set prices for other payors in MultiPlan's OON repricing services.

12. 90 Degree's Client Services Agreement also contains an annual revenue commitment that effectively requires 90 Degree to submit at least some of its OON claim volume to MultiPlan for repricing. This means that even if 90 Degree may prefer to send some claims to MultiPlan's competitor, Zelis, for repricing, it must send a certain percentage of its claims to MultiPlan for repricing.

13. 90 Degree has utilized Data iSight to suppress the allowed amounts paid to healthcare providers for OON services. For example, on August 2, 2023, 90 Degree sent an OON claim for $1,952 to Data iSight for repricing. Data iSight set an allowed amount of $199 for that claim, resulting in an underpayment of $1,753 or 89.78%. On August 4, 2023, 90 Degree sent an OON claim for $1,146 to Data iSight for repricing. Data iSight set an allowed amount of $155 for that claim, resulting in an underpayment of $991 or 86.47%.

14. ***Client Advisory Board Meetings.*** 90 Degree's executives were invited to and attended MultiPlan's secret Client Advisory Board Meetings in 2022 and 2023. At these meetings,

MultiPlan facilitated common discussions between dozens of competing commercial healthcare payors regarding out-of-network pricing strategy, including common pricing actions that the payors could take through MultiPlan and how much they could profit collectively based on those common pricing actions.

15. These Client Advisory Board Meetings were a hotbed for collusion. The executives who attended these meetings did so with the specific stated intention of exchanging information with their competitors on OON pricing in order to increase the profitability of their OON programs by cutting prices paid to healthcare providers and increasing the shared savings fees they charged to health plan subscribers.

16. For example, 79 executives from commercial payors attended the 2022 Client Advisory Board Meeting from September 18-20, 2022 at The Lodge at Torrey Pines in La Jolla, California. Representatives of 90 Degree attended the meeting along with representatives of competitors, such as UnitedHealthcare, Cigna, Aetna, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of California, CareFirst, Consociate, HealthNet of California, Highmark, Horizon Blue Cross Blue Shield, Kaiser, Sanford, and others.

17. These executives did not simply get together to enjoy the beach and play golf. They came to the meetings with the express purpose of sharing confidential information with one another. They attended presentations by MultiPlan executives in which MultiPlan promised that by taking collective action it could help them drive performance for their OON programs and achieve lower prices by acting together in order to avoid the abrasion that would have been caused by consistent underpayment of claims.

18. ***Algorithmic Price-Fixing.*** A defendant need not have attended the Client Advisory Board Meetings to have participated in the conspiracy. MultiPlan makes payors aware that other

17

defendants are using the same pricing methodology as their competitors and that, by doing so, a payor can achieve significant underpayments to healthcare providers for OON services while avoiding abrasion. In a typical sales pitch, MultiPlan provides the names of other payors that are using its repricing services, explains that the prices that MultiPlan sets are used more than 90% of the time, demonstrates that the payor would have achieved significant underpayments compared to its OON prices absent MultiPlan, and then explains in detail how MultiPlan's OON repricing services (the exact same pricing methodology used by the payor's competitors) works.

19.     MultiPlan provides written white papers that explain how a payor's competitors typically implement MultiPlan's OON repricing services. MultiPlan also provides preference forms to payors encouraging them to configure MultiPlan's repricing services the same way.

20.     The result is remarkable uniformity. Nearly all of MultiPlan's payor-clients have adopted the *exact same* underlying formulas to set prices using MultiPlan's OON repricing services. Take Data iSight for example. As of 2020, 98% of MultiPlan's payor accounts that utilized Data iSight for repricing OON services from physicians used the exact same pricing formula to set prices for those OON physician services. Likewise, as of 2020, 89.3% of MultiPlan's payor accounts that utilized Data iSight for repricing OON services from facilities (e.g., hospitals and clinics) used the exact same pricing formula to set prices for those OON physician services.

21.     MultiPlan's OON repricing services explicitly consider the confidential and competitively-sensitive prices that competing payors set for OON services when setting prices for another payor's OON services. Most of MultiPlan's clients use a formula to calculate OON prices in Data iSight that is based on the median price for that OON service in a benchmark group of paid claims from all payors. MultiPlan's contracts with payors recognize that this data is confidential,

but those contracts do not prohibit MultiPlan from using the confidential data to calculate median prices.

22. MultiPlan's OON repricing services also explicitly fix prices. MultiPlan's Data iSight repricing service uses standard overrides. Those overrides are mandatory and cannot be changed by payors. They set the maximum price that MultiPlan will calculate for an OON service and the minimum price that MultiPlan will calculate for an OON service.

23. Moreover, when a payor sends an OON bill from a healthcare provider to MultiPlan's financial negotiation service (FNX) for negotiation, the payor abdicates pricing discretion over that claim. MultiPlan sets the price for that claim and the payor is *required* by contract to abide by the prices that MultiPlan negotiates. Through FNX, competing payors fix prices by using the same company to negotiate claims. MultiPlan also provides the negotiators with confidential information regarding other payors' pricing for OON services through MultiPlan's proprietary "Negotiation Workbench" tool, an internal system that shows the negotiator the recent prices that a provider has accepted in negotiations across all payors.

24. The payors have ample means to monitor one another's compliance with the conspiracy outside of Client Advisory Board Meetings. MultiPlan has in-person meetings with most payors on at least an annual basis, in which MultiPlan's executives often provide information on what the rest of the "industry" is doing concerning OON pricing. MultiPlan meets with some payors on a quarterly or weekly basis. Payors can monitor one another's pricing in near real-time and at a granular level using MultiPlan's PlanOptix service. MultiPlan also provides payors access to detailed monthly reports that show that the cartel is working—the payor is achieving low OON prices with minimal appeals (a form of abrasion). Brokers frequently provide data and information concerning payors' OON program to other payors. One way that brokers do so is by calculating

19

net effective discounts (NED). NED is determined by measuring allowed charges, network and out-of-network utilization, contractual discounts, fees, and out-of-network discounts. Typically, non-contracted out-of-network services (referred to by brokers as "OX") were not considered in the NED calculation. However, in the early 2010s brokers began tracking and comparing OX between payors and telling payors that they needed to improve their OX. Finally, payors routinely share pricing data with one another directly for coordination of benefits purposes when a member has more than one insurance policy (typically when spouses elect to cover each other on separate insurance policies). Payors can, and do, mine that data to determine whether pricing gaps exist between them at particular facilities and for particular services.

25. ***Common economic motive and intent.*** Defendants all shared a common economic motive to use MultiPlan to generate large underpayments for OON services. Prior to around 2010, most payors had an established unilateral methodology for pricing OON services. They would either attempt to negotiate a usual and customary (U&C) rate for the service using their unilateral pricing discretion or would attempt to use a complementary or wrapped network provided by a third-party vendor to set prices based on a discount off of the provider's billed charges. By 2010, those unilateral methods of setting prices were no longer achieving the price ranges that payors preferred. Brokers were telling payors to improve their OON programs so that they could achieve lower OON prices (and therefore an improved OX). The brokers held real sway over the payors because they controlled access to a significant number of employer-sponsored health plans. Because a significant amount of business was at risk, the payors began looking for ways that they could set lower OON prices, but they could not do so unilaterally because the payors feared that abrasion would cause providers to stop providing elective services to their health plan members. So, they settled on a collective pricing solution. By adopting the same pricing methodology—

20

MultiPlan's—the payors were able to avoid or at least blunt the danger of abrasion. They were also able to limit balance billing through MultiPlan's insistence that providers not balance bill for repriced OON services. By coordinating pricing strategies and leveraging their collective market power, the payors had the best of all worlds—massive underpayments, limited abrasion, and a prohibition on balance billing. The only problem was that they had formed a buyer's cartel.

26. ***Oscar Health.*** Oscar Health, Inc. ("Oscar Health") is a Delaware corporation with its principal place of business in New York. As a third-party administrator, Oscar Health performs administrative tasks for health insurance plans, including claims processing and pricing, billing, enrollment, and customer service.

27. Oscar Health has executed out-of-network pricing agreements with MultiPlan, has abdicated out-of-network pricing authority to MultiPlan, and has performed other acts and made other statements in furtherance of the conspiracy.

28. Oscar Health used MultiPlan's OON Repricing Services no later than 2020.

29. Between 2020 and the present, Oscar Health has realized millions of dollars in underpayments to OON medical providers through its participation in the MultiPlan Cartel.

30. Like other members of the MultiPlan Cartel, Oscar Health used MultiPlan's common OON pricing methodology to set prices for those OON services regardless of the reasonableness of providers' billed charges. For example, Oscar Health used MultiPlan's Negotiation Services to pay amounts as low as $36 on a $400 claim for OON services.

31. Upon information and belief, Oscar Health entered into at least one written contract with MultiPlan, similar to the contracts MultiPlan has entered with other competing payors, including United, Aetna, Cigna, and Kaiser. Under this contract, Oscar Health agreed to: (a) send out-of-network claims to MultiPlan via an electronic data interface; (b) allow MultiPlan to set

prices for those claims using MultiPlan's OON pricing methodology; and (c) appoint MultiPlan to negotiate the price of out-of-network goods and services on Oscar Health's behalf if a provider pushes back on the prices set by MultiPlan. Under this agreement, MultiPlan charges Oscar Health a fee equivalent to a percentage of the underpayment generated by using MultiPlan's OON pricing methodology.

32. Oscar Health engaged in parallel conduct with other members of the MultiPlan Cartel by transitioning from using its own independent pricing discretion to using MultiPlan's common pricing methodology to set prices for out-of-network goods and services. Oscar Health applies MultiPlan-calculated rates on a take-it-or-leave-it basis to providers, resulting in payments at rates well below UCR benchmarks such as FAIR Health, consistent with the conduct of other MultiPlan Cartel members.

33. Oscar Health knew or became aware that its agreement with MultiPlan was part of a broader arrangement among competing payors to collectively fix and suppress prices for out-of-network goods and services. MultiPlan informed Oscar Health that numerous other major payors, including the top 15 payors in the United States, were using MultiPlan's pricing methodology to set prices for out-of-network goods and services. MultiPlan communicated to Oscar Health that it could "align" its out-of-network rates with competitors by using MultiPlan's services. As the arrangement continued, each payor (including Oscar Health) became familiar with its purpose and scope, and Oscar Health's continued participation in the MultiPlan Cartel demonstrates its knowledge of and agreement to participate in the broader conspiracy to suppress prices for out-of-network goods and services.

34. Oscar Health's participation in the MultiPlan Cartel would have been against its self-interest absent an agreement with other major payors to do the same. If Oscar Health

22

unilaterally entered into an agreement with MultiPlan to drastically underpay for out-of-network goods and services, providers would refuse to treat Oscar Health's subscribers, causing serious harm to the value and breadth of Oscar Health's insurance offerings and ultimately leading to a loss of subscribers—a phenomenon the healthcare industry refers to as "abrasion."

35. In addition, the pricing information that Oscar Health shared with other payors through MultiPlan was competitively sensitive, and providing such information to MultiPlan would ordinarily disadvantage Oscar Health competitively, as MultiPlan and Oscar Health's competitors could use that information to benefit themselves. Oscar Health's decision to share such information and to use MultiPlan's common OON pricing methodology is economically rational only if Oscar Health knew that its competitors had agreed to do the same.

36. In some cases, Ardent Health has in-network contracts with some of the third-party payment plans offered by Aetna and Oscar Health. However, while Ardent Health is in-network with several health plans, it is not in-network with all of those payors' health plans. Moreover, Ardent Health is not asserting a cause of action or seeking any relief with respect to those in-network charges. Instead, Ardent Health is asserting causes of action only as to purely non-contract charges submitted to members of the MultiPlan Cartel that were repriced pursuant to the cartel agreement described in the Master Complaint.

37. Moreover, no mandatory arbitration clause applies to Ardent Health's claims concerning OON underpayment.

38. As alleged in the Master Complaint, Ardent Health (and Plaintiff, as its assignee) were directly injured by Defendants' illegal conduct because it was underpaid for out-of-network goods and services as a result of the alleged antitrust violations set forth in the Master Complaint.

More specifically, due to the MultiPlan Cartel, Ardent Health was paid less for its out-of-network goods and services than it would have been paid but-for the existence of the cartel.

39. **Point C Health.** Point C Health, LLC ("Point C") is a Delaware limited liability company with its principal place of business located in Chicago, Illinois.

40. In November 2019, Point C acquired Defendant Benefit Plans Administrators of Eau Claire, LLC ("BPA"). This was a part of a corporate roll-up strategy. By June 2024, Point C owned eight TPAs across seven states that had approximately 75,000 member lives under administration. Other subsidiaries and acquisitions of Point C include Mid-American Benefits; Benefit Management, Inc.; and Insurance Administrator of America. Each of these entities, and BPA, has formally rebranded as "Point C."

41. Point C brought in executives from other payors with the express purpose of implementing the OON pricing strategies that those payors used at BPA and other Point C subsidiaries. Benjamin Frisch is the CEO of Point C. He is responsible for overseeing the portfolio of TPAs and executing local market strategies. Prior to joining Point C, Frisch served as a Regional President for Trustmark Health Benefits, one of the largest independent TPAs in the United States. Mr. Frisch is also the CEO of SCP BPA Holdings, LLC, an intermediary holding corporation that sits between Point C and BPA in Point C's corporate hierarchy.

42. Derek Reis-Larson is the COO of Point C. Prior to joining Point C, he was the Senior Vice President and General Manager of MultiPlan and a frequent attendee and presenter at MultiPlan's Client Advisory Board Meetings. At Point C, he is directly responsible for interfacing between Point C's subsidiaries and MultiPlan.

43. Point C uses a "collaborator" model where it integrates various specialty services into the benefit plans that its TPA subsidiaries administer. For out-of-network pricing, Point C's "collaborator" is MultiPlan.

44. Point C's collaboration with MultiPlan has been phenomenally successful. As Benjamin Frisch, Point C's CEO explained on November 19, 2024, "Point C has become the fastest growing TPA" through an "unwavering focus on reducing medical spend."

45. Point C's executives were not content to simply oversee the operations of BPA. They were directly involved in the negotiation and implementation of Data iSight at BPA. Mr. Frisch requested calls directly with MultiPlan concerning BPA's implementation of Data iSight, which he attended without any BPA employees on the call and sent emails to MultiPlan concerning BPA's implementation of Data iSight with no BPA employees on the email chain. Benjamin Frisch attended meetings with MultiPlan, negotiated BPA's agreement to utilize Data iSight, and signed the contract for BPA in his capacity as CEO of SCP BPA Holdings, LLC. Mr. Frisch also pushed MultiPlan to implement a similar pricing methodology with BPA to what he used at Trustmark to generate similar average underpayments.

46. Mr. Frisch received invitations to attend MultiPlan's Client Advisory Board Meetings, whitepapers detailing MultiPlan's OON repricing programs, and client preference forms for BPA's implementation of Data iSight.

47. As a result, Point C was directly involved in BPA's wrongful activities—namely BPA's adoption, implementation, and use of MultiPlan's common pricing methodology for OON claims.

48. **Grand Jury Investigation.** The Antitrust Division of the U.S. Department of Justice is investigating the MultiPlan Cartel. In an SEC filing on May 18, 2026, MultiPlan

25

acknowledged for the first time that it received a grand jury subpoena in August 2024 and that it has been cooperating with that investigation for the last 21 months. Public reporting suggests that this criminal antitrust investigation centers on how MultiPlan's Data iSight pricing methodology violates Section 1 of the Sherman Act.